[Cite as *Great Invest. Properties, L.L.C. v. Bentley*, 2010-Ohio-981.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

GREAT INVESTMENT PROPERTIES,

    PLAINTIFF-APPELLEE,

                                CASE NO. 9-09-36

    v.

THOMAS BENTLEY,

    DEFENDANT-APPELLANT,
    -and-                            O P I N I O N

SOUTHLAND STORAGE FACILITY,

    DEFENDANT-APPELLEE.

Appeal from Marion County Common Pleas Court
Trial Court No. 05-CV-0570

**Judgment Affirmed in Part, Reversed in Part and Cause Remanded**

Date of Decision:   March 15, 2010

**APPEARANCES:**

    *Kevin P. Collins*  for Appellant

    *Thomas A. Frericks* for Appellee, Great Investment Properties

**PRESTON, J.**

{¶1} Defendant-appellant, Thomas W. Bentley (hereinafter "Bentley"), appeals the judgment of the Marion County Court of Common Pleas, which finalized the distribution of the remaining assets of the parties' former limited liability company. For the reasons that follow, we affirm in part, and reverse in part.

{¶2} This matter stems from the dispute between two members of a limited liability company over the disbursement of the proceeds resulting from the company's sale following a judicial dissolution. Plaintiff-appellee, Great Investment Properties, L.L.C. (hereinafter "GIP") and Bentley are the sole members in Southland Storage Facility, L.L.C. (hereinafter "SSF"). GIP's sole member is Mark Freyhof (hereinafter "Freyhof"), and Bentley was the sole member of Southland Storage, L.L.C. (hereinafter "SS"), prior to SSF's formation in July 1, 2003. Additionally, Bentley is also the sole member of another business, Triple T Development Corporation (hereinafter "Triple T").

{¶3} The general facts of the case are largely not in dispute. Bentley formed SS around 1996 or 1997 when he leased undeveloped land beside the Southland Mall in Marion, Ohio, for the purpose of building and operating storage facilities. In 2003, Freyhof went to SS to rent a truck and became interested in becoming part of the SS business. Subsequently, on July 1, 2003, Freyhof, on

behalf of GIP, and Bentley signed an Operating Agreement and an Addendum creating SSF. In the Addendum, the parties stated that they would both be liable for the new debt for the expansion of the business ($382,000), they acknowledged the remaining SS existing debt, and stated that any other debt later determined to have existed prior to SSF would remain Bentley's exclusive obligation. Moreover, although the parties were equal owners of SSF, the parties acknowledged that Bentley had an initial investment of $225,000 in SS, and that in the event of a future sale of the business, after the expenses, commissions, and outstanding debt were paid, Bentley was to be given his $225,000 prior to dividing the remaining balance between the members.

{¶4} The parties' plan was to expand the storage facility business. Freyhof's testimony at trial indicated that, "Our grand expansion plan was to essentially have five buildings which would be A, B, C, D, and E. A and E were two buildings that would be put on later, of smaller size, but B was where the existing office was, or is, in that particular storage space, and Building C and D, C was half built, C was to be completed, and Building D was to be fully built and completed." (July 13, 2009 Tr. at 14). The parties agreed that Bentley's other company, Triple T, would handle the construction and other related work at the facility. (Id. at 11).

{¶5} However, soon after the construction commenced on the new buildings, Freyhof alleged that SSF started having problems with Bentley's Triple T company. Freyhof claimed that although Triple T was paid in full for the construction work, the company never completed the work, and SSF was forced to find other alternatives to have the unfinished work completed. In addition, Freyhof claimed that he started having problems communicating with Bentley, and was eventually forced to send Bentley letters in order to inform Bentley of the various issues SSF was experiencing. In addition, Freyhof claimed that: SSF started having cash flow problems; that because Bentley was absent, Freyhof had to obtain private loans from an individual he knew (Thomas Games); and he himself had to make several personal loans to SSF so that the work could be completed and that SSF could continue to operate.

{¶6} As a result, on August 15, 2005, GIP named Bentley as a defendant in a complaint for judicial dissolution pursuant to R.C. 1705.47. On June 11, 2007, through an Agreed Judgment Entry, the parties stipulated that their differences could not be resolved and that SSF should be dissolved. GIP was appointed the Liquidating Trustee.

{¶7} The assets of SSF were sold on July 5, 2008, for $702,076.20; and after paying the selling expenses, commissions, and secured creditors, the net proceeds were in total $310,299.93, which were subsequently placed in an interest

-4-

bearing account. On July 22, 2008, GIP filed a report notifying the trial court that the sale had closed and SSF had ceased business operations. Out of the net sale proceeds, GIP proceeded to pay the following unsecured indebtedness and expenses:

| | |
|---|---|
| Principal Balance remaining due on Thomas Games loans<br>    Interest at the rate of 18% per annum on<br>    these loans was paid monthly and was<br>    current when the loans were paid in full. | $20,800.00 |
| Principal balance and interest at the rate of 12% per annum<br>from date of loan until payment on July 16, 2008 on<br>loans advanced by Mark D. Freyhof. | $35,317.68 |
| Huntington Bank | $ 5,010.24 |
| VISA | $ 3,367.00 |
| Final Operating and Other Expenses (Net of Income) | $ 4,514.60 |
| TOTAL: | $69,009.52 |

After the payment of the above unsecured loan indebtedness and expenses, $241,290.41 remained for the distribution to the members, subject to the payment of final taxes and dissolution expenses. GIP believed that Bentley owed a net amount of $35,366.97 to SSF (See Plaintiff's Ex. 8), and therefore (out of the remaining $241,290.41) GIP offset Bentley's initial investment ($225,000) with a net amount of $35,366.97, leaving Bentley with a total of $189,633.03, which he received on April 23, 2009.

{¶8} Although GIP had already paid the unsecured loan indebtedness and expenses and had disbursed the remaining amounts of money to the respective members, Bentley still disputed several items on GIP's disbursement report. Because Bentley and GIP were not able to agree on how the net proceeds ($310,299.93) were supposed to have been disbursed, a bench trial was held on July 13-14, 2009 concerning only the issue of disbursement. On August 27, 2009, the trial court adopted findings of fact and conclusions of law and issued an order as to the distribution of the assets of SSF.

{¶9} In particular, the trial court found that the unsecured loan indebtedness and expenses were proper and were valid obligations of SSF, and that they had been properly paid by GIP – in other words, the trial court agreed that $241,290.41 properly remained for distribution to the members. (Aug. 27, 2009 JE at 3, 8). In addition, while the trial court found that a few of the offsets taken by GIP against Bentley's initial investment were not proper, the trial court found that most of the offsets taken against Bentley's initial investment were proper and valid obligations owed by Bentley to SSF. (Id. at 4-7). After subtracting the improper offsets, the trial court found that the total amount due from Bentley to SSF, prior to any further distributions, was $40,411.23. (Id. at 8). However, the trial court also found that Bentley had advanced loans to SSF in the amount of $1,500.00 on 8/23/04, $1,000.00 on 8/19/05, and $1,500.00 on 3/23/06,

and was entitled to interest on such loans at the rate of 12% per annum (the same rate charged by Freyhof on the personal loans he had made to SSF). (Id. at 6). The total principal and interest due to Bentley from SSF for Bentley's loans advanced to SSF was $5,964.95. (Id.). In addition, the trial court found, and GIP agreed, that Bentley was entitled to interest on the $189,633.03 paid to him on April 23, 2009, which totaled $1,369.59. (Id. at 7). Overall, the total amount due to Bentley from SSF equaled $7,344.54. (Id.). Finally, the trial court denied Bentley's claim that he was owed $15,727.88 from SSF for various work done by Bentley's company Triple T and other services Bentley claimed he had done for SSF. (Id.).

{¶10} Overall, the trial court calculated the changes to the Liquidating Trustee's distributions as follows:

| | |
|---|---|
| Amount due SSF from Bentley | $ 40,411.23 |
| Amount due Bentley from SSF | $ -7,344.54 |
| Net due from Bentley | $ 33,076.69 |
| | |
| Amount due Bentley for initial investment | $225,000.00 |
| Credit for net due SSF from Bentley | $ -33,076.69 |
| Subtotal | $191,923.31 |
| Credit for $189,633.03 paid Bentley on 4/23/09 | $-189,633.03 |
| Net balance due Bentley for his initial investment | $ 2,290.28 |

(Aug. 27, 2009 JE at 9). The trial court declared that the remaining assets of SSF, after the filing of the final tax returns and dissolution with the State, were to be divided one-half to Bentley and one-half to GIP. (Id.).

{¶11} Bentley now appeals and raises thirteen assignments of error. We elect to address Bentley's first two assignments of error together.

**ASSIGNMENT OF ERROR NO. I**

**THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY INTERPRETING THE ADDENDUM TO CONVERT TO LOANS FUNDS CONTRIBUTED BY THE MEMBERS.**

**ASSIGNMENT OF ERROR NO. II**

**THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY INTERPRETING THE ADDENDUM TO ALLOW SET OFFS AGAINST MR. BENTLEY'S INITIAL INVESTMENT.**

{¶12} In his first two assignments of error, Bentley argues that the trial court erred in interpreting the parties' Operating Agreement as amended by the Addendum.

{¶13} Issues involving the construction of contracts are matters of law, and thus, when reviewing questions involving contract interpretation, this Court uses a de novo standard of review. *Graham v. Drydock Coal Co.* (1996), 76 Ohio St.3d 311, 313, 667 N.E.2d 949; *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 374 N.E.2d 146, paragraph one of the syllabus, superseded by statute on other grounds. See, also, *Darwin Limes, L.L.C. v. Limes*, 6th Dist. No. WD-06-049, 2007-Ohio-2261, ¶24 (reviewing under a de novo standard of review a trial court's interpretation of a limited liability company's operating agreement).

{¶14} With regard to reviewing the language of the Operating Agreement and any addendums incorporated into the existing agreement, "[t]he cardinal purpose for judicial examination of any written instrument is to ascertain and give effect to the intent of the parties." *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.* (1997), 78 Ohio St.3d 353, 361, 678 N.E.2d 519, citing *Aultman Hosp. Assn. v. Community Mut. Ins. Co.* (1989), 46 Ohio St.3d 51, 53, 544 N.E.2d 920. "'The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement.'" Id., quoting *Kelly v. Med. Life Ins. Co.* (1987), 31 Ohio St.3d 130, 509 N.E.2d 411, paragraph one of the syllabus. Moreover, when interpreting a contract, "[c]ommon words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Alexander*, 53 Ohio St.2d at 241, paragraph two of the syllabus, superseded by statute on other grounds.

{¶15} Copies of the Operating Agreement and the Addendum were admitted as Joint Exhibits A & B, respectively. Both documents were signed by both parties on July 1, 2003. With respect to interpreting the parties' Operating Agreement and Addendum in regards to the distribution of the net proceeds, Bentley claims that the trial court erred in the following two ways: first, by finding that Freyhof had loaned money to SSF and was thus entitled to interest on those

loans; and second, by allowing GIP to take offsets against Bentley's initial investment prior to distributing the remaining assets to the members.

{¶16} First, Bentley claims that the trial court erred by finding that the money given by Freyhof to SSF were loans and not contributions. Bentley claims that Freyhof admitted during the trial that the money he had given were initially contributions that were subsequently converted into loans when Bentley failed to contribute his equal amount into the company. (See July 13, 2009 Tr. at 23, 68, 86, 132). Because there is nothing in the Operating Agreement and in the Addendum that allows a member's contributions to be converted to loans, Bentley argues that the trial court could not have interpreted the agreement to find that the money given by Freyhof were loans. Therefore, Bentley claims that Freyhof was not entitled to the $10,513.68 in interest.

{¶17} First of all, money given by SSF members was not automatically deemed capital contributions. According to the terms of the Operating Agreement, "[e]xcept with the written consent of all of the Members, no Member shall be required to make any additional Capital Contributions to the Company beyond such Member's initial Capital Contribution required pursuant to Section 3.2 hereof." (Joint Ex. A). Therefore, money given by a member to SSF was not necessarily a capital contribution since the plain language of the Operating Agreement provided that "no Member shall be required to make additional Capital

Contributions." See *Blair v. McDonagh* (2008), 177 Ohio App.3d 262, 2008-Ohio-3698, 894 N.E.2d 377, ¶53 (finding that money provided to the limited liability company by defendant member was not necessarily a capital contribution, under the operating agreement which provided that "no member shall be required to make any capital contributions or loan to company.")

{¶18} Moreover, Section 3.8 of the Operating Agreement explicitly states that "*any* Member may, but no Member shall be obligated to, loan or advance funds or guarantee loans to the Company." And in giving such a loan, the member shall be treated as a creditor of the Company and not as a member. Moreover, "[a]ny such loan or advance shall constitute a *loan* from the Member to the Company, and in *no event shall be deemed to constitute a Capital Contribution*." Therefore, the language of the agreement is clear that it did allow members of SSF to loan money to the company. In addition, this provision specifically states that such money given by the member would be considered a loan, and in no way would constitute a contribution.

{¶19} Therefore, with respect to the language of the Operating Agreement and Addendum, we disagree with Bentley's argument that the trial court interpreted a conversion process into the agreement in order to find that Freyhof's payments were loans. First, we note that nowhere in the trial court's judgment entry did it find that the Operating Agreement as amended by the Addendum

allowed for a member's contributions to be *converted* into loans. Secondly, no conversion process was needed because the Operating Agreement as amended by the Addendum did not provide that payments provided by members were automatically considered contributions, *and* additionally the agreement specifically allowed a member to loan money to the company. Therefore, we agree with the trial court's interpretation that payments provided by a member to the company could be considered a loan and not a contribution.

{¶20} At this time we note that in GIP's brief, GIP claims that because Freyhof was not technically a member of SSF, and because only members could give contributions, any money he gave to SSF could have only been a loan and not a contribution. In addition, later in the opinion, Bentley also argues that the trial court should not have found him personally liable for the debts of his other company Triple T because his other company's corporate status protected him from personal liability. While in theory these statements may appear to have some merit, we find that nowhere in the proceedings below did Freyhof or Bentley raise their individual statuses as justifications for either receiving interest payments or preventing liability on debts owed to SSF. Thus, we believe Freyhof and Bentley have not preserved this argument for appeal. See *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, ¶14. Moreover, despite both parties' attempts to use their companies' legal statuses as shields in their dealings with

SSF, we note that the evidence in the record demonstrates that both parties failed to respect legal formalities and that both parties blurred the distinctions between corporate and personal action. See *Siva v. 11138 LLC*, 10th Dist. No. 06AP-959, 2007-Ohio-4667, ¶¶9-10 (discussing and applying the Ohio Supreme Court's test for "piercing the corporate veil" with respect to a limited liability company). Therefore, for all of the above reasons, we decline to address Freyhof's individual status as a justification for his monetary actions for purposes of this appeal.

{¶21} Additionally, Bentley argues that the trial court erred in allowing his initial investment to be subject to setoffs. Bentley points to the provision in the Addendum which allowed him to receive his initial investment of $225,000.00 for support. He claims that the provision is silent as far as allowing setoffs to be applied to his initial investment. Thus, when only looking to the plain language of the provision, Bentley claims that he should have been given the full $225,000.00, and then any purported setoffs should have been applied against the contributions of the parties. We disagree.

{¶22} The Addendum provision that Bentley relies on in support of his argument was entitled "Future Sale of Property," and specifically states:

**Future Sale of Property**
**It is acknowledged by GIP that SS has initial investment of $225,000 in SS. Following is an example of how sale proceeds would be allocated on a future sale of this property once all selling expenses and commissions are paid:**

| | |
|---|---:|
| **Sale of proceeds after selling expenses and commissions** | **$1,400,000** |
| **Less: outstanding debt** | **400,000** |
| **SS initial investment** | **225,000** |
| **Any additional contribution by one party in excess of the other party** | **_____** |
| **Remaining balance** | **$ 775,000** |

**Remaining balance would be split 50/50 with $387,500 to each party (in this example).**

However, Bentley neglects to acknowledge an additional provision in the Addendum in which he agreed that he would be exclusively obligated for any debt that existed prior to the formation of SSF (July 1, 2003), which was discovered by the parties afterwards. The parties explicitly provided for the possibility of pre-existing debts in a section entitled "Existing Debt," which states:

> **Existing Debt**
> **It is agreed that the existing debt with Fahey Bank for earlier development of approximately $180,000 will be refinanced. It will become an obligation of both parties in addition to the new debt for expansion of $382,000. Total estimated new debt to be $576,000. No other debt obligations of SS are known at this time. If any other debt obligations are later determined, they will remain obligations of Thomas Bentley exclusively.**

When reading these two provisions together, it is clear that Bentley's initial investment reflected Bentley's current investment in SS as it existed prior to the formation of SSF with GIP. Under the language of the provisions, any debt obligations later determined to have existed prior to the formation of SSF were Bentley's exclusive obligations, and would thus reduce the amount that he had invested in the company prior to SSF. For example, as we will discuss in more

detail below, Bentley was found to have owed SSF $400 for the CF Professional bill because of services that had been performed prior to the formation of SSF. Thus, based on the language of the agreement, any amount owed prior to July 1, 2003 should have reduced the amount Bentley claimed he had invested in the company prior to the commencement of SSF. Moreover, despite the language of the agreement, we note that reducing the amounts owed prior to the formation of SSF from Bentley's initial investment was equitable and fair given the facts and circumstances of this case.

{¶23} As far as any debt obligations owed by Bentley that arose after SSF's formation, we acknowledge that the provisions in the Operating Agreement as amended through the Addendum are silent with respect to allowing setoffs against Bentley's initial investment. However, we believe that the example calculation on the future sale of the company makes it clear that *any* outstanding debts were to be paid *prior* to the disbursement of Bentley's initial investment. One of the liquidating trustee's responsibilities in winding up the affairs of SSF was to liquidate all of SSF's assets and liabilities, which included any debts that were owed to the company. Here, when SSF was dissolved, Bentley was found to have owed SSF money for a variety of debt obligations he had yet to resolve. Reducing Bentley's initial investment by the amount that he owed SSF allowed

SSF to liquidate all of its assets and liabilities and proceed into winding up its affairs.

**{¶24}** As far any Triple T obligations that the trial court found Bentley owed SSF, as we stated above, we find that the evidence in the record demonstrates that both parties failed to respect their companies' legal formalities and that both parties blurred the distinctions between corporate and personal action. It is clear to this Court that Bentley was conducting Triple T as a sole proprietorship, rather than a corporation. Furthermore, Triple T had no other association with SSF besides providing the construction work to SSF's buildings. Therefore, we believe that it was appropriate to hold Bentley individually accountable for any of his other company's obligations owed to SSF.

**{¶25}** Essentially, despite Bentley's arguments, we believe that the trial court interpreted the parties' agreement appropriately given the language of the agreement. Moreover, given the circumstances surrounding this case, we find that it was equitable to order Bentley to pay SSF the obligations he owed the company out of his available funds, or his initial investment. Again, we believe it was very clear that Bentley remained obligated for the debts of SS prior to July 1, 2003. With respect to the remaining debt obligations found by the trial court, we find that the trial court acted within its equitable powers to balance the rights and liabilities between the two parties. Given the facts of this case, it would not have

been fair to force SSF to give Bentley his full initial investment and then only give SSF a judgment lien against Bentley for the amounts he owed the company. Since the agreement did not specify to the contrary, we find that it was reasonable and equitable to have allowed Bentley's initial investment to be setoff by the amounts he owed SSF prior to the distribution of the remaining assets to the members of SSF.

{¶26} Therefore, Bentley's first and second assignments of error are overruled.

{¶27} For ease of our discussion, we elect to address Bentley's remaining assignments of error together.

### ASSIGNMENT OF ERROR NO. III

**THE TRIAL COURT'S FINDING THAT THE FUNDS CONTRIBUTED BY MR. FREYHOF WERE LOANS WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

### ASSIGNMENT OF ERROR NO. IV

**THE TRIAL COURT'S FINDING THAT THE $400.00 PAID TO CF PROFESSIONAL WAS A VALID OBLIGATION OWED BY MR. BENTLEY TO SSF IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

### ASSIGNMENT OF ERROR NO. V

**THE TRIAL COURT'S FINDING THAT $1,250.00 PAID AS MISCELLANEOUS DEBITS ON OCTOBER 29, 2003, AND NOVEMBER 12, 2003, WERE VALID OBLIGATIONS OWED**

**BY MR. BENTLEY TO SSF IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

**ASSIGNMENT OF ERROR NO. VI[1]**

**THE TRIAL COURT'S FINDING THAT THE $10,000 DRAW ON JUNE 3, 2004, WAS A VALID OBLIGATION OWED BY MR. BENTLEY TO SSF IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

**ASSIGNMENT OF ERROR NO. VII[2]**

**THE TRIAL COURT'S FINDING THAT THE $1,947.00 PAID FOR INSURANCE ON OCTOBER 22, 2004, WAS A VALID OBLIGATION OWED BY MR. BENTLEY TO SSF IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

**ASSIGNMENT OF ERROR NO. VIII**

**THE TRIAL COURT'S FINDING THAT THE $2,500 ALLEGEDLY OWED TO MR. BAER WAS A VALID OBLIGATION OWED BY MR. BENTLEY TO SFF IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

**ASSIGNMENT OF ERROR NO. IX**

**THE TRIAL COURT'S FINDING THAT THE $304.28 PAID TO NEXTEL WAS A VALID OBLIGATION OWED BY MR. BENTLEY TO SSF IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

---

[1] We note that this assignment of error originally stated the date of the alleged $10,000 draw was on June 23, 2004, but Bentley acknowledged the typographical error and subsequently corrected the date in his reply brief.

[2] We note that in his original brief, the heading for Bentley's seventh assignment of error duplicated his sixth assignment of error, even though he addressed the issue concerning the insurance payments in his arguments. Bentley later acknowledged the typographical error and subsequently changed the heading in his reply brief.

**ASSIGNMENT OF ERROR NO. X**

**THE TRIAL COURT'S FINDING THAT THE $1,490.00 PAID TO HAINES WAS A VALID OBLIGATION OWED BY MR. BENTLEY TO SSF IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

**ASSIGNMENT OF ERROR NO. XI**

**THE TRIAL COURT'S FINDING THAT THE $2,700.95 PAID TO MS. PFLEIDER WAS A VALID OBLIGATION OWED BY MR. BENTLEY TO SSF IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

**ASSIGNMENT OF ERROR NO. XII**

**THE TRIAL COURT'S FINDING THAT THE $5,434.48 PAID TO MS. PFLEIDER WAS A VALID OBLIGATION OWED BY MR. BENTLEY TO SSF IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

**ASSIGNMENT OF ERROR NO. XIII**

**THE TRIAL COURT'S FINDING THAT SSF DID NOT OWE MR. BENTLEY IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

{¶28} In Bentley's remaining assignments of error, he claims that certain findings made by the trial court were against the manifest weight of the evidence.

{¶29} In determining whether a judgment is against the manifest weight of the evidence, the trier of fact is in a better position to observe the demeanor of the witnesses, examine the evidence, and weigh the credibility of the testimony and evidence. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 461

N.E.2d 1273. Thus, we cannot substitute our judgment for that of the trier of fact when there exists competent, credible evidence going to all the essential elements of a case. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 280, 376 N.E.2d 578.

{¶30} Only Freyhof and Bentley testified at trial, and as such, the trial court only had their testimony plus their evidentiary materials to rely upon when rendering its decision. Given the necessary reliance on the parties' testimony, we want to highlight the fact that we leave questions of the credibility and weight of the evidence to the trier of fact. *Jones v. McAlarney Pools, Spas & Billiards, Inc.*, 4th Dist. No. 07CA34, 2008-Ohio-1365, ¶15; *Cole v. Complete Auto Transit, Inc.* (1997), 119 Ohio App.3d 771, 777-78, 696 N.E.2d 289. This is because the trier of fact is in the best situation to view the witnesses and their demeanor, gestures and voice inflections and to use those observations to weigh credibility. *Myers v. Garson* (1993), 66 Ohio St.3d 610, 615, 614 N.E.2d 742; *Seasons Coal Co.*, 10 Ohio St.3d at 80. Based on these observations, the trier of fact may choose to believe all, part, or none of the testimony of any witness. *Jones* at ¶15, citing *Rogers v. Hill* (1998), 124 Ohio App.3d 468, 470, 706 N.E.2d 438 and *Stewart v. B.F. Goodrich Co.* (1993), 89 Ohio App.3d 35, 42, 623 N.E.2d 591. Therefore, to determine whether "some competent credible evidence" existed, "[the appellate court's] role is simply to insure the decision is based upon reason and fact. We do

not second guess a decision that has some basis in these two facts, even if we might see matters differently. Rather, we must defer to the trier of fact in that situation." *Orebaugh v. Am. Family Ins.*, 4th Dist. No. 06CA11, 2007-Ohio-3891, ¶21.

<u>Freyhof's loans</u>

**{¶31}** Bentley argues that the trial court's finding that the amounts of money Freyhof gave SSF were loans and not contributions was against the manifest weight of the evidence.

**{¶32}** With respect to this finding, the trial court found that the monies given by Freyhof as shown in Plaintiff's Exhibit 36 were loans and that they constituted indebtedness of SSF that was to be paid prior to any distributions to the members. (Aug. 27, 2009 JE at 8).

**{¶33}** Bentley claims that not only did Freyhof admit that the monies were contributions, which were subsequently converted into loans, but Freyhof did not submit any documentation corroborating his claim that the amounts listed in Plaintiff's Exhibit 36 were loans. After reviewing the record, we find that there was competent, credible evidence to support the trial court's finding that the money Freyhof gave to SSF constituted loans.

**{¶34}** At trial, GIP introduced Plaintiff's Exhibit 36 into evidence, which was a summary of the loans Freyhof had given to SSF over the last few years.

(Plaintiff's Ex. 36). Freyhof testified as to its contents and stated that the document listed the date he had given each loan, the principal amount he had given ($24,804.00), and the interest calculated for each individual loan, which had been calculated at a rate of 12% for a term of five years ($10,513.68). (July 13, 2009 Tr. at 64-65). Freyhof stated that the total amount due to him from SSF on his loans was $35,317.68, and that he had paid himself that amount out of the net proceeds from the sale of SSF, prior to the distribution of SSF's remaining assets to the members. (Id. at 65).

{¶35} Freyhof did state at one point in the trial that he believed he was entitled to interest because his contributions had been converted to loans; however, there were several other instances in which he clearly stated that the money he had given to SSF constituted loans, and that they were not contributions. (July 13, 2009 Tr. at 64, 89). However, despite Bentley's heavy reliance on the language Freyhof used at trial, we do not find Freyhof's use of the word "contributions" in his testimony dispositive. Overall, when reviewing Freyhof's testimony in its entirety, it is clear that Freyhof believed that the funds he had given SSF were loans, not contributions, and would thus be repaid to him at a later date with interest. Moreover, Freyhof even agreed that any money Bentley had given to SSF should also be considered loans, rather than contributions, and that Bentley should equally be able to receive interest on the amounts he had advanced to SSF.

As such, we find it dispositive that trial court similarly chose to treat money given by Bentley to SSF as loans and not contributions, and awarded Bentley the same interest rate it had given Freyhof on his loans. (See Aug. 27, 2009 JE at 6).

{¶36} Therefore, we find that the trial court's finding that the money Freyhof gave to SSF constituted loans to SSF and not contributions was supported by competent, credible evidence.

{¶37} However, while we find that there was competent, credible evidence to support the trial court's finding that Freyhof had given SSF loans, we do not believe that there was competent, credible evidence to support its finding that the interest rate on Freyhof's loans (and consequently Bentley's loans) should have been calculated at 12%. When reviewing the record all this Court could find in support of the 12% interest rate was a statement from Freyhof saying that the reason he had picked 12% was because he "felt it was a fair rate to charge Southland Storage," especially considering Games had been charging SSF an 18% interest rate on his private loans. (July 13, 2009 Tr. at 65).

{¶38} While Freyhof's statement that 12% was a fair rate to charge SSF on his personal loans was some evidence for the trial court to rely on, the law in Ohio provides that a default statutory interest rate should be awarded in the absence of a written contract between the two parties. Under R.C. 1343.03(A), "when money becomes due and payable upon any bond, bill, note, or other instrument of writing,

* * * the creditor is entitled to interest at the rate per annum determined pursuant to section 5703.47 of the Revised Code, unless a written contract provides a different rate of interest in relation to the money that becomes due and payable, in which case the creditor is entitled to interest at the rate provided in that contract." Furthermore, "[a]n oral statement * * * does not meet the requirement of R.C. 1343.03(A) as to the existence of a written contract between the parties." *Bunnell Electric, Inc. v. Ameriwash*, 12th Dist. No. CA2004-01-009, 2005-Ohio-2502, ¶16, citing *Hobart Bros. Co. v. Welding Supply Serv., Inc.* (1985), 21 Ohio App.3d 142, 144, 486 N.E.2d 1229. See, also, *Yager Materials, Inc. v. Marietta Industrial Enterprises, Inc.* (1996), 116 Ohio App.3d 233, 687 N.E.2d 505 (citing other courts adopting this rule). Here, there is no documentary evidence to support an interest rate different from the statutory rate; therefore, we find that Freyhof was only entitled to statutory interest at a rate of 10 percent per annum. See R.C. 1343.03(A). Additionally, because the trial court also awarded Bentley 12% interest on the money he had advanced to SSF and there was no other documentary evidence supporting an interest rate different than the statutory rate, we find that Bentley was only entitled to the statutory interest rate under R.C. 1343.03(A).

{¶39} Overall, we find that trial court erred in finding that Freyhof and Bentley were entitled to 12% interest rate on the payments they had provided to

SSF that were considered loans. Therefore, as to the parties' loans, the judgment entry should reflect that the parties are only entitled to the statutory interest rate under R.C. 1343.03(A).

### $400.00 to CF Professional

{¶40} Bentley argues that there was not competent, credible evidence to support the trial court's finding that he owed SSF $400.00, the payment to CF Professional. Specifically, Bentley claims that because GIP failed to produce the purported CF Professional invoice detailing the $400.00 obligation, the trial court's finding was against the manifest weight of the evidence.

{¶41} In its judgment entry, the trial court found that the $400.00 for payment to CF Professional was for professional services rendered to SS prior to July 1, 2003, and thus was a valid obligation of Bentley's owed to SSF. (Aug. 27, 2009 JE at 4). After reviewing the record, we believe that there was some competent, credible evidence to support the trial court's finding that the $400.00 payment to CF Professional was Bentley's obligation.

{¶42} As we stated above, according to the terms of the Operating Agreement as amended through the Addendum, Bentley specifically promised to remain exclusively responsible for any debt that was discovered to have existed prior to the formation of SSF on July 1, 2003. (Joint Ex. B). While GIP did not submit CF Professional's invoice, Freyhof did testify that SS had used CF

Professional's accounting services before he became a member of SSF in July 2003. (July 13, 2009 Tr. at 35). Additionally, after Freyhof's arrival to SSF, Freyhof stated that CF Professional's accounting services were discontinued and that he became responsible for preparing the company's taxes for the following years. (Id. at 98). Despite discontinuing CF Professional's accounting services upon Freyhof's arrival, Freyhof stated that SSF paid CF Professional $400.00 on 8-19-03. (Id. at 35); (Plaintiff's Ex. 11). Bentley offered no testimony or evidence disputing Freyhof's testimony that CF Professional's accounting services had been discontinued after Freyhof's arrival in July 2003.

{¶43} As we stated above, we leave questions of the credibility and weight of the evidence to the trier of fact, who may choose to believe all, part, or none of the testimony of any witness. *Jones*, 2008-Ohio-1365, at ¶15; *Cole*, 119 Ohio App.3d at 777-78. Here, it is clear that the trial court chose to believe Freyhof's testimony regarding the discontinuation of CF Professional's services, and the testimony that its services were not used after Freyhof's arrival. Therefore, with this evidence, the trial court could find that any payment to CF Professional must have been for services rendered prior to July 1, 2003, and as a result, under the terms of the Addendum, the payment was therefore Bentley's exclusive obligation. Because SSF paid the payment to CF Professional, and Bentley was responsible

for any obligations owed by SS prior to July 1, 2003, Bentley owed SSF the $400.00 payment.

**{¶44}** Overall, we believe that the trial court's finding that Bentley owed $400.00 to SSF for the payment to CF Professional was supported by some competent, credible evidence, and cannot say that it was against the manifest weight of the evidence.

<u>$250.00 on October 29, 2003 & $1,000.00 on November 12, 2003</u>

**{¶45}** Bentley argues that the trial court's finding that he owed SSF for the $250.00 and $1,000.00 payments made on October 29, 2003 and November 12, 2003, respectively, were against the manifest weight of the evidence. In particular, Bentley claims that there was no evidence that established these payments as Bentley's obligations: the payments were labeled "miscellaneous debits" on the bank statements dated November 28, 2003; and Freyhof could not say for sure for what the payments were made, except that he just assumed they had been improper payments to Bentley from Bentley out of SSF funds.

**{¶46}** With respect to these amounts, the trial court found that "[t]he setoffs of $250.00 and $1,000.00 on 10-29-03 and 11-12-03, respectively, as shown on Plaintiff's Exhibits 8 were phone transfers made by Defendant from SSF's checking account to Triple T's account without any supporting invoice or documentation," and therefore, they were valid obligations of Bentley owed to

SSF. (Aug. 27, 2009 JE at 5). Again, after reviewing the record, we believe there was some competent, credible evidence to support the trial court's finding.

**{¶47}** At trial, GIP submitted Plaintiff's Exhibit 16 into evidence, which was a bank statement dated October 31, 2003. (July 13, 2009 Tr. at 41); (Plaintiff's Ex. 16). In this bank statement, an item for $250.00 is highlighted and labeled in the "description" portion of the bank statement as "miscellaneous debit," dated 10/29/03. (Plaintiff's Ex. 16). Next to the description there is a handwritten note which states, "Phone transfer from TTT." (Id.). Freyhof testified that the handwritten note was made by SSF's secretary/bookkeeper, Dorothy (Dottie) Pfleider, and that her note indicated that the debit concerned Bentley's other company, Triple T, and not SSF. (July 13, 2009 Tr. at 41-42). Similarly, in Plaintiff's Exhibit 18, there is another highlighted item for $1,000.00, also labeled "miscellaneous debit," and dated 11/12/03. (Plaintiff's Ex. 18). Next to the description of this item there is another handwritten note stating, "to TTT." In addition, on the last page of the exhibit, there is another bank document to SSF informing SSF that it has charged the SSF account "for a transfer per phone call from Tom 2:12 PM" for $1,000.00 dated 11/12/03. (Id.). Moreover, on page four of the exhibit, there is a document dated 11/12/2003, which illustrates that there was a transfer to "TTT" in the amount of $1,000.00. (Id.). Freyhof testified at trial that the handwritten note "to TTT" was again in Dottie's handwriting, and

that although Freyhof did not know what the debit was for, he did state that SSF did not have any invoice for that debit nor was he aware of any obligation that SSF had at that time to Triple T for $1,000.00. (July 13, 2009 Tr. at 44-45).

**{¶48}** It was within the trial court's discretion to believe Freyhof's testimony that there were no outstanding obligations to Triple T at the time of the phone transfers, and as a result that any money given to Triple T by Bentley from SSF funds was not proper. Based on Freyhof's testimony, along with the bank statements with the bookkeeper's notations and the written bank notice evidencing Bentley's phone transfer, we find that there was some competent, credible evidence to support the trial court's finding that the two debits were obligations owed by Bentley to SSF, and that its finding was not against the manifest weight of the evidence.

<u>$10,000 draw on June 3, 2004</u>

**{¶49}** Bentley argues that the trial court erred in finding that the $10,000 draw on June 3, 2004 made payable to Triple T and signed by Bentley was an obligation owed by Bentley.

**{¶50}** In its judgment entry, the trial court made the following finding, "[t]he setoff of $10,000 as shown on Plaintiff's Exhibit 8 for the unauthorized check to Triple T Developing Corporation was written by Defendant Thomas Bentley for work not performed and is a valid obligation of Defendant owed to

SSF." (Aug. 27, 2009 JE at 6). Bentley argues that GIP failed in satisfying its burden to produce some competent, credible evidence that the $10,000 was an unauthorized draw made by Bentley, because even Freyhof admitted that he had no idea for what the payment was made. We disagree and find that after reviewing the record there was some competent, credible evidence to support the trial court's finding that the $10,000 draw on June 3, 2004 made payable to Triple T and signed by Bentley was an unauthorized draw, and thus was a valid obligation owed by Bentley to SSF.

{¶51} At trial, GIP introduced three exhibits to support its position that this $10,000 draw had been made by Bentley and had been unauthorized. First, it introduced Plaintiff's Exhibit 25, which was SFF's bank statement for the period of 06/01/04 through 06/30/04. In the statement under the category of "Checks Paid," it listed check number 7187 for $10,000.00 was paid on 06-03. (Plaintiff's Ex. 25). Additionally, Plaintiff's Exhibit 26, which was a copy of check number 7187 from SSF's bank, specifically showed that the SSF check was for $10,000 made payable to "Triple T Developing Corporation," dated 6/1/04, and signed by Thomas Bentley. Moreover, in the memo portion of the check it stated "SSF Building Reimbursement."

{¶52} Further, Freyhof testified that at the time of the $10,000 draw, SSF had no invoice from Triple T evidencing outstanding bills for work. Freyhof

stated that at that time there was no money owed by SSF to Triple T. (July 13, 2009 Tr. at 53). In fact, Freyhof further stated that the Operating Agreement as amended through the Addendum, laid out the specific terms as far as the authority to write checks from SSF's accounts. (Id.). According to the terms of the Operating Agreement as amended through the Addendum, any operating or capital expense greater than $2500 required both Freyhof and Bentley's signatures, and any debt obligation greater than $5,000 required both signatures. (Id.); (Joint Exs. A & B). Freyhof continued and said that on November 7, 2003, he and Bentley had signed a corporate authorization resolution with its bank concerning the authority to sign checks. (July 13, 2009 Tr. at 54); (Plaintiff's Ex. 27). The resolution stated that any member would have the authority to write checks up to $5,000, but anything greater than $5,000 would require both signatures. (Plaintiff's Ex. 27).

{¶53} Bentley testified that as far as he knew his other company, Triple T, was never paid for work that the company had not completed. (July 13, 2009 Tr. at 143). Specifically, with respect to the unauthorized $10,000 draw, Bentley claimed that it had been payment for work Triple T had done on the storage facilities. (Id.). Additionally, Bentley introduced Defendant Exhibit G, which was purportedly SSF's balance sheet for October 24, 2003, which stated, "N/P Triple T Developing in the amount of $11,947.00." Bentley said that these balance sheets

were put into his mailbox by SSF's secretary/bookkeeper, and at the very least, he claims that they illustrate that GIP had already setoff this money against money owed to Bentley and should not be allowed to setoff the amount again. (July 13, 2009 Tr. at 144-48). However, at trial when asked about the SSF balance sheets, Freyhof stated that they maybe were correct, but he could not say for sure because he had not prepared the documents. (Id. at 132-33).

{¶54} While we acknowledge that Freyhof did not know what the $10,000 draw to Triple T was in payment for, likewise Bentley did not submit any Triple T invoice to corroborate his testimony that his other company had done $10,000 worth of work around June 2004 to justify his payment to Triple T out of SSF funds. Moreover, it was within the trial court's discretion to believe Freyhof's testimony and GIP's evidentiary materials (bank statement, bank's copy of check, and bank resolution) over Bentley's testimony and evidentiary materials (SSF's balance sheets). Based on all of the above evidence – in particular the parties' agreement regarding the authority to write SSF checks and the copy of the check signed by *only* Bentley and made out to Triple T for $10,000 – we find that there was some competent, credible evidence to support the trial court's finding that the $10,000 draw on June 3, 2004 was unauthorized and a valid obligation of Bentley's owed to SSF.

<u>$1,947.00 insurance payment on October 22, 2004</u>

**{¶55}** Bentley argues that the trial court erred in finding that Bentley owed $1,947.00 to SSF for paying Triple T's truck insurance coverage on October 22, 2004.

**{¶56}** With respect to the insurance coverage paid by SSF, the trial court found, "$1,947.00 for Triple T's truck insurance premiums to Simpson Insurance after 7/01/03 as shown on Plaintiff's Ex. 8 are personal expenses of Defendant Thomas Bentley and are valid obligations of Defendant owed to SSF." (Aug. 27, 2009 JE at 6). Bentley claims that according to the balance sheets he submitted at trial and that he relied on for support above, it appears that GIP already setoff this amount against the money to Bentley. However, after reviewing the record, we believe that there was some competent, credible evidence to support the trial court's finding.

**{¶57}** In addition to the SSF balance sheets submitted by Bentley showing a negative amount of $11,947.00, Freyhof testified that after talking to Dottie, he discovered that SSF was making additional insurance payments besides SSF's general policy, and that these payments were for a truck that SSF did not own. (July 13, 2009 Tr. at 59). Upon his discovery, Freyhof stated that he contacted the insurance provider and they sent him a letter detailing the different premiums that SSF had been paying, specifying the premiums that had been paid on a Triple T

truck, which in total equaled $1,947.00. (Id. at 59); (Plaintiff's Exs. 33, 34). Eventually, Freyhof said that he decided to cancel SSF's policy with the insurance company. (July 13, 2009 Tr. at 58); (Plaintiff's Ex. 34). Freyhof sent the insurance company a letter in which he acknowledged that Triple T had coverage under the same policy, but that SSF was canceling its portion of the policy and that if the company wanted to communicate with anyone regarding the Triple T policy it should contact Bentley. (July 13, 2009 Tr. at 58-59); (Plaintiff's Ex. 34).

{¶58} Furthermore, Freyhof sent a letter to Bentley on November 26, 2004, informing Bentley that he had cancelled SSF's insurance policy with its original insurance provider and that he had told the insurance provider that Bentley would be responsible for any premiums for Triple T's insurance coverage. (July 13, 2009 Tr. at 19); (Plaintiff's Ex. 1).

{¶59} Despite Bentley's argument that the balance sheets showed SSF had already setoff this amount against the amount it owed him, GIP introduced evidence indicating that SSF had paid the premiums for Bentley's separate company, Triple T, and was now seeking reimbursement for the payments. Clearly, the trial court chose, and had the discretion, to believe GIP's evidence and Freyhof's testimony, and because there was some competent, credible evidence to support its decision, we cannot find that its finding was against the manifest weight of the evidence.

<u>$2,500 payment to Baer for retirement</u>

**{¶60}** Bentley claims that the trial court's finding that he owed $2,500 to SSF allegedly for the payment of Baer's pension was against the manifest weight of the evidence.

**{¶61}** The trial court found that "[t]he setoff of $2500.00 for Defendant's share of SSF's commitment to Bob Baer in lieu of retirement fund contribution, as shown on Plaintiff's Exhibit 8 is a valid obligation of Defendant owed to SSF." (Aug. 27, 2009 JE at 6). After reviewing the record, we believe there was some competent, credible evidence to support its finding.

**{¶62}** During Bentley's testimony, he specifically stated that he had never agreed to pay Baer a pension. (Jul 13, 2009 Tr. at 149). While Bentley said that he and Freyhof had discussed the issue of Baer's pension, no agreement was ever made because Bentley refused to participate in the plan to pay Baer $5,000.00. (Id.). However, GIP listed in its Plaintiff's Exhibit 8 the following item, "Bob Baer, B-A-E-R, $2500.00, TB share in lieu of retirement." Freyhof explained this entry at trial:

> **When Bob Baer was hired as a General Manager we had discussion [sic] with him about a salary and a portion to be paid to a pension plan, which we currently did not have a pension plan in place. He agreed to come forward and work because he was working with Bob Evans at the time, which they had plans of this nature. So he agreed to come and work with us. We never did put a pension plan in place, ensuing problems that we**

-35-

> **had eradicated that, so as a consequence, or as a - - when I spoke with Bob I suggested to him to be able to pay that to him in just general compensation rather than a pension, and he agreed to that. * * * The total amount was $5,000.00. I paid a portion to him for $2500.00, which did not go through Southland Storage, and then there was - - what I believed to be Tom's portion, $2500.00 left to be paid.**

(July 13, 2009 Tr. at 60-61). When asked whether he had discussed the idea with Bentley, Freyhof stated that they had "some general discussion" regarding this arrangement with Baer. (Id. at 61). Again, on cross-examination, Freyhof acknowledged that he had personally paid Baer $2500.00; however, when asked about whether he had anything in writing documenting this promise to Baer, Freyhof said that he only had an unsigned copy of a contract, which was never admitted into evidence. (Id. at 114-15). Nevertheless, GIP submitted Plaintiff's Exhibit 1, which was a letter dated November 26, 2004 from Freyhof to Bentley regarding several items concerning SSF, and that was sent to the address Bentley listed on the Operating Agreement. (Plaintiff's Ex. 1). Particularly, in item number six, Freyhof wrote to Bentley, "We promised Bob $5,000 in pension for every year he completes with SSF. I know you and I don't have the cash so here is what I propose. We value the business at $800,000 and give him 1% of our stock and voting priviladges [sic]. If I don't hear from you on this I will assume it is ok with you. I would like to give him something in writing by December 10, 2004." (Plaintiff's Ex. 1).

**{¶63}** The letter sent from Freyhof to Bentley evidenced the promise that they made to Baer concerning his pension, and supported Freyhof's testimony, and it was within the trial court's discretion whether to believe this evidence rather than Bentley's testimony. Based on the above evidence, we find that there was some competent, credible evidence to support the trial court's finding that Bentley owed $2,500 to SSF for payment to Baer's pension, and that it was not against the manifest weight of the evidence.

$304.28 Nextel payment

**{¶64}** Next, Bentley argues that the trial court's finding that he owed SSF $304.28 for the payment to Nextel was against the manifest weight of the evidence. He claims that the payments were made for an additional service SSF provided to its customers.

**{¶65}** With respect to this particular bill, the trial court found, "[t]he setoff of $304.28 for Nextel charges as shown in Plaintiff's Exhibit 8 were for Defendant's personal cellular phone service and are valid obligations of Defendant owed to SSF." (Aug. 27, 2009 JE at 4). Bentley claims he had transferred the storage facility's phone number to his cell phone so that people could call in whenever for storage or U-hauls, which he claimed was a service SSF provided to its customers. However, after reviewing the record, we believe there was

competent, credible evidence to support the trial court's finding that the Nextel bills were for Bentley's personal cell phone.

{¶66} GIP introduced Plaintiff's Exhibit 13 at trial which consisted of Nextel bills in regards to the account of Thomas Bentley. These bills in total equaled $304.28, and were not only labeled as Thomas Bentley's account, but were also addressed to Thomas Bentley personally. Further, Freyhof testified that these Nextel bills were for Bentley's personal cell phone, and that Bentley had submitted them to Pfleider for payment and that she paid the bills from SSF's account. (July 13, 2009 Tr. at 39-40). During cross-examination, Freyhof admitted that, while Pfleider had paid Bentley's Nextel bills out of SSF's account, the documentation GIP submitted in Plaintiff's Exhibit 14 showed that Freyhof had signed the checks to Nextel for the payments. (July 13, 2009 Tr. at 110). However, Freyhof explained further that, "[Pfleider] prepared, generally on a weekly basis, several checks to be paid, and I would come over and sign 'em. * * * there'd be a handful of checks and I'd just sign them and go on, presuming she's already done the work." (Id. at 110). Even Bentley admitted the Nextel bills were from his personal cell phone, but only because he had transferred the storage facility's number to his cell phone so that people could call in and SSF could provide a 24/7 operation. (July 13, 2009 Tr. at 150-51).

{¶67} It is clear that the Nextel bills were for Bentley's personal cell phone, even Bentley admitted to such in his testimony. However, it was within the trial court's discretion to believe Freyhof's testimony that the Nextel bills were from Bentley's personal cell phone usage and not Bentley's testimony that his personal cell phone had been used for SSF business purposes. Based on the evidence above, we find that there was some competent, credible evidence to support the trial court's finding that the $304.28 Nextel bill was an obligation owed by Bentley to SSF, and thus was not against the manifest weight of the evidence.

$1,490.00 payment to Haines

{¶68} Bentley argues that the trial court's finding that he owed SSF $1,490.00 for payment to Haines Publishing was against the manifest weight of the evidence.

{¶69} With respect to this finding, the trial court stated, "[t]he setoff of $1490.40 for the settlement payment to Haines as shown on Plaintiff's Exhibit 8 was a payment of a settlement of Southland Storage's obligations to Haines incurred prior to 7/01/03 and is a valid obligation of Defendant owed to SSF." (Aug. 27, 2009 JE at 5). Bentley argues that even though GIP submitted documentation of a check written to Haines Publishing, Inc., dated 11/25/2003, there was no evidence indicating that the period of Haines' service was prior to

July 1, 2003. As a result, the trial court could not have found that it was an obligation owed by Bentley to SSF. However, in addition to the documentation submitted by GIP, Freyhof testified that check number 6057 was written to Haines Publishing for the services that it had provided to the company prior to July 1, 2003. (July 13, 2009 Tr. at 49); (Plaintiff's Ex. 19). It was within the trial court's discretion whether to believe Freyhof's testimony that this bill was submitted for work that had been done prior to July 1, 2003. Therefore, we find that there was some competent, credible evidence to support the trial court's finding, and the finding was not against the manifest weight of the evidence.

### $2,700.95 payment to Pfleider

{¶70} Bentley next argues that the trial court's finding regarding Pfleider's paid wages was against the manifest weight of the evidence.

{¶71} The parties' disputed whether a certain portion of SSF's secretary and bookkeeper, Dorothy (Dottie) Pfleider's wages were earned prior to July 1, 2003, and were thus exclusively obligations of Bentley's owed to SSF because SSF paid her. Pfleider also worked for Triple T. In its judgment entry, the trial court found "[t]he setoffs in the amount of $2,065.68 and $637.27 for payment to Dottie for wages before 7/01/03 as shown on Plaintiff's Exhibit 8 were for obligations of Southland Storage accrued prior to 7/01/03 and are valid obligations of Defendant owned [sic] to SSF." (Aug. 27, 2009 JE at 5). After reviewing the

record, we find that there was competent, credible evidence to support the trial court's finding.

{¶72} At trial, Freyhof testified that Dottie Pfleider was the bookkeeper for SS, and later SSF, and that she also worked for Bentley's construction company, Triple T. (July 13, 2009 Tr. at 36). She was paid $8.00 an hour. (Id. at 38). Freyhof stated that there were several checks that SS had issued to Pfleider prior to July 1, 2003 that were never cashed. (Id. at 46-48). In particular, Freyhof testified that check numbers 6047 and 6048 were for wages that had been earned and not paid prior to July 1, 2003, and that were subsequently paid for in November 2003. (Id. at 46); (Plaintiff's Ex. 19). Plaintiff's Exhibit 19 included copies of the paychecks, and specified the number of hours worked, which in total equaled 401.75 hours in a two week period from November 11, 2003 to November 24, 2003. (Plaintiff's Ex. 19). There are only 336 hours in a two week period.

{¶73} Based on the above, there was some competent, credible evidence to support the trial court's finding that $2,700.95 was owed by Bentley to SSF for wages owed to SS's bookkeeper prior to July 1, 2003, and we cannot say that the finding was against the manifest weight of the evidence.

<u>$5,434.48 payment</u>

{¶74} Bentley argues that the trial court erred in finding that he owed SSF $5,434.48 for the work SSF had to pay another company to finish the work Triple

T was supposed to do, despite the fact that SSF had already paid Triple T for the work.

**{¶75}** The trial court made the following finding with respect to this issue, "[i]n addition to the setoffs shown on Plaintiff's Exhibit 8 there is also due SSF from Defendant, the sum of $5,434.48 paid by SSF to Levering Brothers for the installation of two HVAC units for which the Defendant's construction company Triple T Developing Corporation was paid but was never installed and $370.00 paid to M & M Construction for the concrete apron for which Defendant's construction company, Triple T Developing Corporation, was paid but never installed." (Aug. 27, 2009 JE at 6). After reviewing the record, we find that there was some competent, credible evidence to support the trial court's finding.

**{¶76}** At trial, Freyhof testified that even though Triple T was paid in full for the work it was contracted to do on an air conditioning unit and a concrete apron, Triple T never finished the work. (July 13, 2009 Tr. at 65-66). As a result Freyhof said he had to go hire third parties, Levering Brothers and M & M Construction, to complete the uncompleted work. (July 13, 2009 Tr. at 65-67). Levering Brothers completed the HVAC work for $5,343.48, and M & M Construction completed the concrete apron for $370.00. (July 13, 2009 Tr. at 66-69); (Plaintiff's Exs. 37, 38).

**{¶77}** GIP also introduced several letters that not only evidenced the parties' escalating communications problems, but documented Freyhof's attempts at getting the HVAC work completed. In the November 26, 2004 letter sent by Freyhof to Bentley and discussed above, he also informed Bentley of the following:

> **I am receiving quotes on finishing the HVAC units on the two buildings that you did not finish. We have had several clients complain about mold in their units. You have not returned my phone calls concerning this so I will move ahead on getting this finished out. The quotes are from $5,000 to $8,000.**
> **\* \* \***
> **Your remaining silent and not returning calls is making any effort to make decisions is difficult. However, I will continue to make decisions for SSF for its betterment. I want this to be a facility that is finished and looking complete.**

(Plaintiff's Ex. No. 1). On December 6, 2004, Freyhof sent Bentley another letter, this time stating:

> **It was good to speak to you last Thursday and begin to discuss the HVAC in the two buildings. We need to get a decision this week to finish the buildings. I have a quote from Levering Brothers and one from Wenigs, the quotes are different by $700 with Levering being lower.**
> **\* \* \***
> **It is paramount that a decision be made ASAP for HVAC for building "C" and "D".**

(Plaintiff's Ex. 2); (See, also, Plaintiff's Ex. 3). On December 20, 2004, Freyhof wrote Bentley again:

**The HVAC issue is still a major issue and minor progress has been made.**
**\* \* \***
**I told you I had quotes from HVAC professionals to address this problem. I had Levering Brothers scheduled to start on Wednesday December 15th to complete the job. You had Bob Woods show up on the same day. He worked one day and that has been it.**
**I will voice the same position again as before. You have had since October 2003 to finished [sic] building D and April 2004 to finish building C. Neither is complete and working satisfactorily. I recommend to contract with Levering and get these completed to avoid any additional unhappy customers.**
**Your lethargic attitude about completing this is affecting how customers view SSF and that is a reflection on all of us who are associated with SSF.**

(Plaintiff's Ex. 4); (See, also, Plaintiff's Ex. 5). As far as holding Bentley liable for Triple T's obligations to SSF, as we stated above, it is clear to this Court that Bentley was conducting Triple T as a sole proprietorship, rather than a corporation. Therefore, we believe that it was appropriate to hold Bentley individually accountable for any of his other company's obligations owed to SSF. And based on the evidence presented above, we find that there was some competent, credible evidence to support the trial court's finding that Triple T/Bentley owed SSF for the work it had to pay a third party to finish even though it had paid Triple T/Bentley to do the work. As such, we cannot say that the finding was against the manifest weight of the evidence.

<u>$15,727.88 owed to Bentley</u>

**{¶78}** Bentley claims that SSF owed Triple T money, which totaled $15,768.00, and that the trial court erred by finding that SSF did not owe Bentley this money. Bentley presented Defendant's Exhibit U at trial, which was a compilation of the invoices that were allegedly never paid by SSF for a variety of work done/paid for by Triple T. With respect to the money Bentley claimed that he was owed by SSF, the trial court found:

> **Although the Defendant claimed he was due some $15,727.88 from SSF for various invoices presented in Defendant's Exhibit U, the Plaintiff presented proof that the invoices for the Store Front Pad Building C, Security Lighting, and Landscaping had been paid in full. Two of the other invoices were for charges prior to 7/01/03. The remaining invoices were never agreed to or authorized by the Plaintiff and were for routine day to day responsibilities that both parties shared equally and for which neither was entitled to payment pursuant to the terms of the Operating Agreement as amended.**

After looking at the record, we believe that there was competent, credible evidence to support the trial court's finding.

**{¶79}** At trial, Bentley presented Defendant's Exhibit U as evidence that SSF owed him a total of $15,727.88 for work his other company Triple T had performed, or work that he had paid for on behalf of SSF, but was subsequently never reimbursed by SSF. Defendant's Exhibit U contained a total of 30 Triple T invoices.

{¶80} First of all, Bentley claimed that three of the invoices were for work performed by Triple T on SSF's buildings, and that these following amounts were never paid: Store Front Pad of Building C ($1,080.00); security lighting ($6,998.51); and landscaping ($2,467.00). However, on cross-examination, Bentley was presented with Plaintiff's Exhibit 40, which he acknowledged were the same three invoices he had submitted to SSF, but these documents showed that the invoices had been paid in full. (July 14, 2009 Tr. at 185-86); (Plaintiff's Ex. 40). Therefore, we find that there was some competent, credible evidence to support the trial court's finding that these three invoices had already been paid by SSF.

{¶81} In addition, in Defendant's Exhibit U, there were two invoices dated for work done prior to July 1, 2003, specifically: Invoice No. 2506243 dated on 06-24-03 described as "Unit 217 moved to Unit 301" for the amount of $150.00; and Invoice No. 2506113 dated on 06-11-03 described as "Unit 129 moved to Unit 301" for the amount of $100.00. Thus, we find that there was some competent, credible evidence supporting the trial court's finding that two of the other thirty invoices submitted by Bentley were for work done prior to July 1, 2003.

{¶82} The remainder of the invoices compiled in Defendant's Exhibit U were for installation or repair work done to SSF's units, for truck pickups, or for moving customers' items to different storage units. However, after reviewing the

record, we find that there was competent, credible evidence to support the trial court's finding that the remaining invoices were for services that were never agreed to or for routine day-to-day responsibilities that both parties shared equally and were not entitled to compensation.

{¶83} At trial, Bentley claimed that another service called "Two Men and a Truck" was a service offered by SSF, in which they would "pick up and deliver or bring [clients' merchandise] to the storage or take it to their home." (July 13, 2009 Tr. at 151). When asked who was a part of this service, Bentley said that it was himself and his employees at Triple T, and that he never got reimbursed for any of the money that he paid to run this service, which included deposits, gasoline, payments for labor to Triple T employees. (July 13, 2009 Tr. at 151-52). However, on cross-examination, Bentley acknowledged that the Two Men and a Truck service was only "indirectly" affiliated with SSF and was not a separate legal entity. (July 14, 2009 Tr. at 203-04). As far as the invoices that were in regards to moving clients' merchandise, Bentley also acknowledged that he had never discussed with Freyhof about charging SSF for doing those things. (Id. at 189-90). Moreover, with respect to the truck pick-up invoices, Bentley stated that when customers would need a truck to go out of town, if SSF did not have a truck on its lots, Bentley would have to go to another U-Haul facility and pick-up another truck, and when he did so he would always bring with him another

employee and would charge SSF for "the gas and the labor to go pick up that truck." (July 14, 2009 Tr. at 194-95). Nevertheless, when asked about whether there was any agreement between Freyhof and himself regarding whether Bentley would be paid for the time he spent getting these extra trucks, Bentley said that there had only been a verbal agreement between the two of them. (Id. at 196). Finally, we note that pursuant to the terms of the Operating Agreement as amended through the Addendum, neither party was entitled to compensation.

{¶84} Overall, it was within the trial court's discretion whether to believe Bentley's testimony concerning the amount of money he claimed was due to him from SSF. Because there is competent, credible evidence to support the trial court's finding, we cannot say that it was against the manifest weight of the evidence.

Conclusion

{¶85} As stated above, Bentley's first and second assignments of error are overruled. With respect to Bentley's third assignment of error, it is sustained as to the finding on the interest rate, and overruled as to the remaining arguments in that assignment of error.

{¶86} Additionally, Bentley's fourth, fifth, sixth, seventh, eight, ninth, tenth, eleventh, twelfth, and thirteenth assignments of error are overruled.

**{¶87}** Having found error prejudicial to the appellant herein in the particulars assigned and argued, we affirm, in part, and reverse, in part, the judgment of the trial court and remand for further proceedings consistent with this opinion.

*Judgment Affirmed in Part*
*Reversed in Part and*
*Cause Remanded*

**WILLAMOWSKI, P.J. and SHAW, J., concur.**

**/jlr**